EARL BUTNER, BY HIS NEXT FRIEND, L. B. BUTNER, v. BROWN
BROTHERS LUMBER COMPANY.

(Filed 24 December, 1920.)

**1. Employer and Employee—Master and Servant—Third Persons—Minors
—Infants—Safe Place to Work—Negligence—Evidence—Nonsuit—
Trials—Invitation.**

Among other machinery in its woodworking plant, the defendant had
an edging machine of standard kind in good order, with the cogwheels
moving the carriage covered by metallic hoods in the usual manner, pro-
tecting the employees working thereat in the manner therein required of
them, under the rules of the company, children were forbidden to come into
the mill, with notices placed in the mill to give sufficient notice thereof;
that plaintiff, a bright lad of eleven years of age, was sent to the mill by
his father to get some of the edging placed on the outside of the mill,
forbidding the son to enter the mill, which had also been forbidden him
by the supervising officers of the mill; that upon the invitation of a
worker at the edging machine, a lad of about sixteen years of age, and
in the absence of other employee, the plaintiff entered the mill to get his
edging from around the machine, and his clothes caught in the cogs, caus-
ing the injury alleged, while he was in a dangerous position not required
by the operation of the machine: *Held,* in the absence of evidence suffi-
ciently definite to show an abrogation of the rule, the invitation and
direction of the employee, having a definite work to perform as a laborer
at the edger, *was not within. his authority to bind his principal, the*
defendant, and the evidence is insufficient to show negligence on the part
of the defendant; and a motion as of nonsuit thereon should have been
granted.

**2. Same—Duty of Employer.**

The duty of an employer to furnish his employee a safe place to work
at a power-driven machine, in this case an edger in a woodworking plant,
does not extend to an outsider who has entered the shop, forbidden, whose
clothing has caught in the cogs of the machine, causing the injury for
which he seeks damages in his action.

CLARK, C. J., dissenting.

CIVIL ACTION, tried before *Harding, J.,* and a jury, at August Special
Term, 1920, of YANCEY.

The action is to recover damages for physical injuries caused by alleged
negligence of defendant company in not properly safeguarding its ma-
chinery and in permitting plaintiff, a child twelve years of age, or little
over, to go about same whereby he was caught in the cogs of certain
portions of the machinery and received painful and permanent injuries
to plaintiff's great damage. There was denial of liability by defendant
and on issues submitted, the jury rendered a verdict for plaintiff assess-
ing his damages. Judgment on verdict and defendant company excepted
and appealed.

*Charles Hutchins and A. Hall Johnson for plaintiff.*
*Watson, Hudgins, Watson & Fouts for defendant.*

HOKE, J.   On careful consideration, we are of opinion that no liability
has been established against defendant company, and the motion for
nonsuit should have been sustained.   There was evidence tending to show
that in March, 1918, plaintiff, a bright boy, then about 12 years of age,
had his arm caught in the cog-wheels of an edging machine in the lum-
ber mill of the defendant company and had it crushed so that it had to
be amputated, that this machine was in the shape of a long table, on
which there was a carriage propelled by a gearing of cogwheels at the
side of the table and on this carriage the lumber was moved forward
through the machine, cutting off the edges as the term imports.   The
foreman usually stands at the front, feeding the machine or guiding
the lumber as it goes through, and at the other end another man or boy
with the duty of tailing the edger, and when the lumber has passed
through it goes on to the trimmer table, about 20 feet beyond, and the
edgings are thrown into the hog or off to the side of the machine so as
to keep the same clear.   That the machine in question was a standard
machine in good order and the cogwheels which moved the carriage were
covered by metallic hoods going two-thirds of the way down in the usual
manner of such coverings and affording ample protection to any em-
ployee engaged in operating the machine or working about it, and the
only way to get caught, as stated by several witnesses, was to "come up
under it."   There was also full testimony on the part of the defendant
that by the rules of the company and its managers children were for-
bidden to come within the mill, notices to that effect being placed gen-
erally about in the mill in places likely to give warning, and they were
never allowed in the mill except when they slipped in.   That on the oc-
casion in question, Corliss Rishell being the edger or foreman in charge
of the machine, and Joe Rishell, an ordinary laborer, about 16 or 17 years
of age, acting as tailer, the plaintiff was sent by his father to the mill
to get some of the edging for the purpose of doing repairing about his
lot, and which were to be obtained on the outside of the mill where they
were usually placed when sold or given away, and both father and son
testified that the father had instructed the plaintiff on no account to go
in the mill for the edgings.   And speaking to the fact of plaintiff being
in the mill and about the machine at the time, Corliss Rishell, the fore-
man as stated, but now in the employment of others in the State of Penn-
sylvania, testified as follows:   "In March or April, 1913, this boy, Earl
Butner, came to Brown Brothers' sawmill at Eskota where I was work-
ing.   He came after some edgings.   I told him particularly and emphati-
cally not to come in the mill while it was being operated.   There was no

room for him there. He was in the way. I told this boy, plainly and emphatically, and he knew what I said and understood me, that he was not allowed on the mill, and should not be there while the mill was running. He obeyed my orders at first for a period of about ten minutes. Then when I was away from my regular place for a few minutes, he came back in and went in under a string of live rolls and got his arm hurt. The first thing I knew of this was that I heard him holler. I thought at first that his coat was caught, and I went over to see if I could help him out. We then discovered the accident and had him relieved as quick as possible. The boy could not possibly have gotten injured in the cog gears if he had been standing up. These cog gears were protected by metal coverings. The boy got down under them in violation of the instructions that I had given him." This testimony, however, was denied by the plaintiff, who after saying that his father had told him not to go in the mill, testified that he went in on the invitation of Joe Rishell, the tailer. The circumstances more directly revelant being given in his own language as follows: "The day I lost my arm I went in to get some strips at the edger machine where Joe Rishell was working; he was between 16 and 17 years old. I was going down the road and Joe Rishell came to the door of the mill and motioned for me to come up and I could not hear what he said for the mill was going. He told me to go in and get the strips out, that he was busy and could not help me turn but would help after a while if he got time, and I went in there. The way I went the edger was 50 feet from the door. I know where the edger machine was for I had been in there before; I do not know that I had ever seen Joe Rishell at the edger machine before but I had seen other men there. The edger was running and to get the strips I had to go in between the roller bed and the hog. Joe Rishell told me to go in there and get them, and I went in there and threw out 8 or 10 strips and went to pull out another one and it hung, and I jerked at it and my arm came back and caught in the cogs and ground it off." From this the testimony chiefly relevant and controlling as we view the case, it appears that the machine, a standard one, was in good shape, that the cogwheels were covered two-third of the way down the usual way and affording protection to the employees called on to operate or work about it in the course of their employment, that the plaintiff, at the time, was in the mill against the will of the owners or of any employee who had authority or duties give him a position of any significance and certainly without their knowledge or consent. The boy himself testifying that he didn't see any of the owners or Corliss Rishell, the foreman, that morning, and under such conditions, if responsibility for the injury could be fixed upon the defendant at all, it must be by reason of the invitation or direction of Joe Rishell, the laborer, for the plaintiff to come in and get the edgings for himself. Joe Rishell, as

shown, was a lad 16 or 17 years old, an ordinary laborer in the mill who had a definite task given him to do—that is to keep the machines clear of lumber passing through and the edgings that were cut from it. So far as appears, he had no authority to invite anyone into the mill contrary to the rules of the company, nor did he have any right to dispose of these edgings to outsiders, and in such case our decisions are to the effect that liability may not be imputed to the owners and proprietors by reason of his speech or conduct on this occasion, the same being entirely outside of the course and scope of his employment. In *Dover, Admr.,* 157 N. C., p. 324, a lad 10 years of age was invited or permitted by the driver of a team, an employee, to ride with him. In a runaway the boy was killed and recovery against the owner of the team was denied. The decision being as follows: "The master is not responsible for the negligent acts of the servant employed for the ordinary duty of driving a team of mules hitched to a wagon for the purpose of hauling lumber, in causing an injury to one whom, in the absence of the master and without his knowledge, express or implied, he had permitted to ride on the wagon loaded with lumber; for such acts are beyond the scope of the servant's employment, and not done in furtherance of the duties owed by the servant to the master." A similar application of the principle had been previously made in *Marlowe v. Bland,* 154 N. C., 140, where the proprietor directed a hired man to cut and pile the corn stalks in a field on his farm, and having given this specific direction, went off with a load of lumber, the employee having cut and piled the stalks as directed, concluded he would burn them, and the wind rising, the sparks were carried to a nearby woods of another owner, setting the same on fire and doing considerable damage. Here, too, the liability on the part of the employer was denied, the court in the opinion saying in part: "As a general proposition, the duty of a hired man is to do what he is told, and in this instance he was directed to do a definite, specific thing, importing no menace to any one, and after completing the work that was given him to do, he goes on of his own motion and does something else, engages in an act which is not infrequently a source of danger to neighbors, and does it under circumstances amounting to a negligent wrong and causing substantial pecuniary injury"; and the decision denying recovery was stated as follows: "When the master has given direction to his servant, a 'hired man,' to cut and pile cornstalks in his field, which was done by the servant, and then, without direction from the master, and in his absence, he set fire to the stalks, which caused sparks to be carried by the wind, which set fire to and destroyed plaintiff's property, the doctrine of *respondeat superior* does not apply, the thing the master ordered his servant to do being harmless in itself, and there being no express or implied authority given the servant to burn the stalks, which alone caused the damage complained of." Similar rulings has been

made in many other cases with us on the subject, and the authorities elsewhere are in very general support of this position. *Sawyer v. R. R.,* 142 N. C., 1; *Vassor v. R. R.,* 142 N. C., 68; *Daniel v. R. R.,* 136 N. C., 517; *Howe v. Newmarch,* 94 Mass., 49; *Stone v. Pugh,* 115 Tenn., 688; *Schulwitz v. Lumber Co.,* 126 Mich., 559; *Kiernan v. Ice Co.,* 74 N. J. L., 175; Wood on Master and Servant, sec. 279; 26 Cyc., pp. 1528-1533. We are not unmindful of evidence on the part of the plaintiff tending to show that children were often seen playing in defendant's mill, and that one witness testified that he had seen children 'getting out strips just where Earl got hurt.' So far as playing in the mill is concerned, there was no evidence that they ever played in this particular locality, which was somewhat inaccessible, being protected by the placing of the machines and, furthermore, and as a complete answer to any such position, the plaintiff was not injured while he was playing, but on his own testimony, says he was in there at work on the invitation of Joe Rishell. And as to the testimony of children being seen there getting out strips, the custom was shown to be for the strips, or edgings, to be thrown on the outside and the statement of the exception referred to is entirely too indefinite and infrequent to fix the employer with knowledge that their customs and rules were being departed from and violated, in the present instance, and even if the cogs should have been more completely covered in the performance of defendant's duty towards its employees, as suggested further for plaintiff, such a duty would not arise to plaintiff, who was in the mill at the time contrary to the rules and without the knowledge of the owners, and against his father's instructions, working about the machine, on the invitation of a laborer who had no right to give it, and whose position and duties, as we have endeavored to show, were not such as to render his employer in any way liable for his acts on the facts as presented.

This will be certified that the judgment and verdict be set aside and the cause dismissed as on the motion of nonsuit.

Reversed.

CLARK, C. J., dissenting: It needs no authority to sustain the proposition that on a motion for nonsuit the Court should consider the evidence only in the aspect most favorable to the plaintiff and with the most favorable inferences that the jury can draw from the evidence, for reason that the jury whose sole province it is to weigh the evidence, or to draw inferences therefrom, might take that view.

Applying this familiar and just rule, the defendant company operated a large band sawmill which, besides the large band saw, had four sets of saws running—seven saws in one set, four in another, eleven in another, and one in the other. There were two sets of live rolls and two others. Nearby was the mill village where the employees of the mill

lived close around the mill. In this village there were forty young boys, and it was the custom of the boys to play in the mill and around the saws, cogs, and rolls above mentioned, and it was not only the custom for the children to play in the mill, but to go near the dangerous machinery and get strips of wood that had been sawed off and carry them home. The defendant not only permitted the children to play in the mill and to come there for strips, but also employed children at work in the mill under the statutory age, among them this plaintiff, as was testified to by the president of the defendant. One of the witnesses for the defendant (McMahan) testified that he had seen children in the mill, had never seen them ordered out; that he had seen them come in, pick up and carry away strips; that it was not unusual for children to go between the machines, and that there were no printed notices for the children to stay out. Another witness testified that he had worked in the mill, that he repeatedly saw children there; that no one ran them out; that there were no orders to keep them out; that they came to get strips and "when these were not thrown out for them, they would go where the plaintiff got hurt; I have gone there myself, and have seen other children go there for strips." He added that he was under 14 at the time of the trial and that he had worked in the mill two years previously. Dan Hunnicutt testified to the same effect; also Carl Robertson, who testified that he was an employee in the mill when he was 13 years old.

The plaintiff, a boy 11 years of age at the time of the injury, went to the mill that day to get some strips which the mill superintendent had agreed with the plaintiff's father to have thrown out. The plaintiff testified, and his testimony must be taken as true on this motion, as well as the above, that the mill was running, and that the man who was running the edger where these strips were thrown off, called him in and told him to go and get the strips out, that he was too busy and could not help him. And he (the plaintiff) being used to going into the mill, did not think that there was any danger in going where he was told, and went in to get the strips; that the strips were lying beside the machine, and as he stooped down to pick them up his sleeve was caught in the cogs and his arm being drawn in, was ground off above the elbow; that they had to stop the machine and take it apart to get him out; that he was sent to the hospital, where his arm was amputated near the shoulder.

He also testified that he had been in the habit of playing in the mill for a long time and that he had been going there a long time to get strips; that nobody had ordered him out of the mill; that he and the other children were allowed to play there, and liked to do so, and that no one had ever warned him of any danger being incident to the machinery there operated.

The cogwheel in which the plaintiff's arm was cauaght was a bevel gearing about 6 inches in diameter and the president of the defendant testified that the covering came down half way on the side.

. There was a conflict of testimony as to who was running the edger that day. The defendant introduced the deposition of Corliss Rishell that he was running the edger, and instead of letting the plaintiff in, he told him to stay out. But the plaintiff and his father testified that Joe Rishell was running the edger and Joe does not testify to the contrary, but this is immaterial for under this motion the testimony for the plaintiff must be taken as true that Joe Rishell was running the edger, and that he told the 11-year-old child to come in and get the strips and (as the plaintiff testifies) that he and the other boys were accustomed to play there, that he had not been warned of any danger and had repeatedly gotten strips at that place, that he had never been ordered out of the mill, and that he and other children had been allowed to play there.

Whether the above evidence was true, or that of the defendant, which was only contradictory in part, was a matter which the plaintiff was entitled to have the jury decide and the court on this motion for nonsuit was compelled to take as true and properly refused the motion for nonsuit. This case is very much similar to *Ferrell v. Cotton Mill,* 157 N. C., 528, where *Judge Walker* clearly stated the principle applicable to this case.

This little child of 11, with his fellows living immediately around the mill in the company's houses and playing in the mill for months without any objection, had been to the exact spot where the little plaintiff had lost his arm, he had not been warned of any danger, and when he was told by the edger to go there and get strips which the edger said he was too busy to get himself, since this would require the stopping of the machine, he was not even a technical trespasser. The entire conduct of the defendant was negligent, and there was no negligence whatever on the part of the plaintiff, taking, as we must, the evidence for the plaintiff to be true, and the jury found it to be true.

Besides the above, which was sufficient, it was the grossest negligence for the defendant to case only the upper half of a 6-inch bevel gearing, revolving rapidly, leaving the lower half of this dangerous instrumentality entirely uncovered. The draft made by the saw or between the door and the window, or by some other cause would readily and naturally drive some of the little child's clothing into this rapidly revolving and unprotected gearing.

The negligence of the defendant is further enhanced by the fact that not only the children of its employees in the adjacent houses were allowed to play in the mill but in open defiance of law, the defendant employed some of these very children, including the plaintiff, to work therein when under the age prescribed by law.

It is difficult to see how the trial judge could have directed a nonsuit on this evidence, which shows habitual and continued negligence of the defendant and the absence of any negligence on the part of the plaintiff.

If the defendant had evidence which could overthrow the above testimony for the plaintiff, the jury did not believe it, and it was not within the jurisdiction of the judge to do so. Very many cases are authority which forbade the judge to direct a nonsuit, among them *Ainsley v. Lumber Co.,* 165 N. C., 122, and *Starling v. Cotton Mills,* 168 N. C., 230. This child, 11 years old at the time, must go through life with one arm gone. He gave his account how it happened. The jury said he told the truth; can we say the contrary?